Carr, J.
When this case was before this court at a former time, the only question which I discussed in my opinion then delivered, was the question of fact, Whether Morgan engaged to indorse Selby’s note at bank, as a part of the contract for the sale and purchase of the bank stock ? Coming to the. conclusion, that the promise to indorse formed no part of the contract, there was no necessity for my investí *585 gating the law of the case. I think the impression on my mind was, that, if the promise to indorse formed a part of the contract, the transaction was usurious; but it was an impression taken up without examination. The new evidence has changed my view of the facts. When it was found that Selby could not effect a loan of the banks, and the treaty for Morgan’s stock commenced, the idea seems to have been, that by depositing the stock with the bank, it would lend the money, on the note of Selby without an indorser. But on the 7th March, 1825, (when Selby was, probably, at Alexandria, and the treaty on foot) the president of the bank, at the request of Morgan, applied to the directors, to know whether they would lend Selby 4000 dollars on his depositing as a security stock of the banks of Alexandria and Potowmac, to the amount of 5000 dollars ? The board refused the loan on the stock, unless Selby’s note should be indorsed by Morgan. An entry to this effect was made on its journal, and of this, the president says, he gave Morgan information. From this time, I. cannot but suppose, that the treaty for the stock, proceeded upon the ground, that it was to be hypothecated, Selby’s note given to the bank, and Morgan to indorse it. Selby bought the stock ai par, executed his bonds to Morgan for 5000 dollars, payable with interest, in two and three years, and secured by deeds of trust; he gave about twenty per cent, above the cash price in the market; Selby then deposited the stock with the bank, with a power of sale; executed his note, which Morgan indorsed; and the bank paid Selby the money lent, it is contended, that the transaction, though in appearance a sale of stock, was, in truth, a loan of money at exorbitant usury. This is the question for examination.
In all such cases, lord Mansfield tells us, “ The view of the parties must be ascertained, to satisfy the court, that there is a loan and borrowing, and that the substance was, to borrow on the one part, and to lend on the other.” We have decided often, that the sale of stock, or any other *586 property, at whatever price, does not of itself constitute usury. In Greenhow v. Harris, judge Roane says, “ I distinctly admit the right of a party to sell property, such as bank shares, at whatever price is agreed on. The transaction becomes usurious, only, when the object is to borrow money, and not to purchase stock, and the price of the stock is graduated as a device to effect the purpose; or where there is a combination between the seller of the stock on a credit, and the purchaser for cash.” Does the case before us fall within the definitions here given? Was the substance, to borrow on the one part, and to lend on the other, and not to purchase stock ? I can have no doubt,, that Selby meant to buy Morgan’s stock, and Morgan to sell it. It is equally clear, that Selby was in distress for money, and wanted the stock as a means to raise it $ and that Morgan knew this. Indeed, their first communications on the subject, grew out of a request of Selby that Morgan would assist his agent Hunter, in an attempt to negotiate a loan with the banks. The attempt failed, and then Morgan wrote to Selby telling him that he had stock, which he would sell him at par, giving him such time as would enable him to make collections; pointing out the facilities which the stock would afford in raising money, especially by giving a stock note to the banks, or an individual one, by which he tells him he could command the money at once. The whole aspect of the case exhibits Morgan as the seller of stock, not the lender of money. And the difficulty with me has been to bring this within any of the cases which have been cited. In Stribling v. Bank of the Valley, 5 Rand. 132. we decided, that the sale of stock at twenty per cent„ above the market price was usury, because (solely because) there was indissolubly linked to that sale, a loan of money by the seller to the buyer. Here that distinctive feature is wanting. Morgan sells his stock, the bank lend its money, not to Morgan but to Selby ; not on Morgan’s credit, but on the credit of Selby, the stock and Morgan: a loan not influenced by the purchase and rate *587 of the stock, but made by the bank, in the course of its • every day business; a loan agreed on all hands to be free from usury. I cannot well imagine, how a loan thus distinct, thus fair in itself, where no combination, no community of interest or profit can he detected, between the seller of the stock and the lender of the money, should make the sale of the stock usurious, which without it all admit would be untainted.
This case was likened to Lowe v. Waller. There, Waller wanted to raise £ 200. on a bill of exchange. Stratton fy Harris hearing of it, sent their broker to let him know, that they would lend him £ 100. in money, and £ 100. in goods, but that the goods should be choice sorts •, he should have them at the warehouse price, and should not lose by them. When Waller went to see them, they pretended that they had no money then, but goods only, and desired that the business might lay over. Thus, they lured him on for about three weeks, knowing his extreme distress for money. At length, they sent him word, if he would come the next day, he should have £ 50. in money, and the rest in goods. He attended. One of the partners went out, and soon returned, saying he could get no money, but if Waller would take the whole in goods he should have them directly. Waller agreed : a broker who was present, sorted out the goods: they were immediately taken by him to an auctioneer, who sold them for £ 117. a sacrifice of nearly fifty per cent.. Lord Mansfield said, it was impossible to wink so hard, as not to see, that there was no idea between the parties, of any thing but a loan of money ; and that the only purpose of Stratton fy Harris was to contrive to get more than legal interest. The device was, to give the transaction the colour of the sale of goods. Stripping oft' this covering, the court considered the goods sent to auction, as still the goods of Stratton Harris; the money raised by the sale, as their money; and this money advanced by them to Waller, at a premium of near fifty per cent. And this has always been, and I trust always will be, considered a per *588 fectly sound decision. But does our case fall within it? I cannot think so. There seem to me some strong distinctions between them : from first to last, the treaty between Selby and Morgan, was for a sale of stock. Morgan never offered to lend Selby money. It was, in truth, a sale of stock. If you connect it with the bank transaction, it was still a sale of stock, which Morgan knew Selby meant to hypothecate with the bank for a loan of money, and to enable him to effect which, Morgan agreed to indorse bis note. Still there was no borrowing and lending between Selby and Morgan; no sale of the-stock to the bank to raise the money; nor any sale or sacrifice of it contemplated. The 5000 dollars in stock were pledged, as a collateral security for the 4000 dollars borrowed by Selby of the bank, not of Morgan; and it was understood, that the loan was for twelve months. Thus Selby would have twelve months to return the loan, and redeem his stock; and within this time, he seemed very confident that he could make his collections. In truth, eighteen months were given him: if within that time he had paid off his note, the stock would not have been sacrificed: he would have held it. In Pollard v. Baylors, 6 Munf. 433. it is strongly laid down, that a penalty from which a party may deliver himself, by complying with his contract, does not make such contract usurious. While Selby kept the stock, the dividends represented its par value in money; and, in the mutations of the market, the stock might have risen far above its par value. We have known this the case with more than one bank. This case, therefore, does not fall within the' principle of Lowe v. Waller.
The case of Kent v. Lowen was also relied on. There, Lowen made a promissory note to Coales & Co. for £153. 15. 0. payable at ninety days; it was indorsed to the plaintiff, who brought assumpsit on it; the defence was usury: the facts were these : Coates fy Co. accommodated Lowen with their acceptance at three months, in consideration of which Loteen executed his note to them at ninety days for the same sum, with the addition of hoo and a half per cent. *589 commission. The device attempted there, was to cover the usury by that usage, under which country bankers have been allowed to take a certain commission, besides legal interest, for their trouble and expense; but that was for discounting bills: here (lord Ellenborough said) there was no colour for a commission, Coates Co. being the acceptors, and not the discounters of the bill; and the commission was a mere cloak for usury. 1 consider that just as plain a case of usury, as if Coates fy Co. had advanced money to Lowen to receive two and a half per cent, above legal interest. Their acceptance bound them to pay the money unconditionally, and it was their money on which they took the usury. But our case is not like that. Morgan sold stock to Selby, and indorsed Selby’s noto to the bank : but this did not make him the lender of the money : the bank was the lender: he was a mere surety for the borrower, lending his name to him. The difference of his position from that of Coates 8/ Co. is strikingly illustrated by the fact, that indorsers are allowed to take a commission for the loan of their credit and responsibility.
The case of Dunham v. Dey was cited. It turns on precisely the same point with Kent v. Lowen; and admits of the same answer. I beg leave to refer, though, to what justice Spencer says, upon the subject of indorsers : “ It has been said (he observes) that it is the usage for indorsers of bills of exchange, and sureties on custom house bonds, to take a per centage, for advancing their responsibilities. I see nothing improper in this; there is no loan of money directly, or indirectly, in either of these cases; they come neither within the terms nor the mischiefs of the statute; and they are innocent transactions.”
Thus the case before us seems to me essentially different from those cited in its support. The sale of the stock being by Morgan, and the loan of the money by the bank, without the slightest proof of collusion or combination between them, I cannot so connect the transactions, as to taint the sale of the stock with usury.
*590 I think the chancellor was right in refusing to reinstate the injunction.
Cabell, J.
Upon a careful re-examination of this case, I am now of opinion, that the transaction was not usurious ; and, therefore, that the order of the chancellor overruling the motion to reinstate the injunction, must be affirmed.
Brooke, J. I am clearly of the same opinion.
Order affirmed.